UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

    -against-

JASON PALACIOS and EDWIN PALACIOS,
                     Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
97-cr-646 (CBA)

**AMON, United States District Judge:**

    Defendants Jason Palacios ("Jason") and Edwin Palacios ("Edwin") (together, the "Palacios brothers" or "Defendants") move for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018. (ECF Docket Entry ("D.E.") # 137 ("Defs. Mot.").) The government opposes Defendants' motion. (D.E. # 141 ("Gov't Opp'n").) A few months after the motion was briefed, Defendants supplemented their briefing with two letters citing additional authority supporting their motion for sentence reduction. (D.E. # 145 ("First Defs. Ltr."); D.E. # 148 ("Second Defs. Ltr.").) For the following reasons, I find that both Defendants have demonstrated extraordinary and compelling reasons warranting a reduction in their sentence. I further find, based on my consideration of the relevant section 3553(a) factors, a reduction of Defendants' murder in aid of racketeering sentences to thirty years while maintaining their consecutive five-year sentences for firearms violations is appropriate. I therefore GRANT IN PART Defendants' motion.

## BACKGROUND

### I. Offense and Conviction

    Identical twin brothers Jason and Edwin Palacios were eighteen years and thirty-one weeks old on September 19, 1994, when they committed the crimes resulting in the sentences they are

1

now serving. (D.E. # 99 at 14-15.)[1] During a six-day trial in October 1997, the government's evidence showed the following. The Palacios brothers were members of the Latin Kings gang in Spring Valley, New York. United States v. Palacios, Nos. 98-1458, 98-1459, 1999 WL 197216, at *3 (2d Cir. Mar. 24, 1999). The Latin Kings became involved in a dispute with a rival gang in Spring Valley, culminating in an altercation in which an associate of the Palacios brothers shot and wounded two members of the rival gang. Id.; (see also Gov't Opp'n 1.) Fearing reprisal, the Latin Kings sought money to purchase firearms to respond to the threat. Palacios, 1999 WL 197216, at * 3. Together with co-defendant Jose Suarez ("Suarez"), the Palacios brothers planned to rob a livery cab driver. Id. at *2. The group proceeded to hire cab driver Alexander Vulfson ("Vulfson") to drive them to Brooklyn. Id. When they arrived, Jason shot Vulfson twice in the back of the head, and Jason and Suarez then robbed Vulfson. Id. Initially, Edwin fled the scene after his brother shot Vulfson, but Edwin returned shortly thereafter when Jason called him back. Id.

Following the trial, the jury convicted the Palacios brothers of four charges: 1) murder in aid of racketeering ("VICAR") in violation of 18 U.S.C. § 1959(a)(1) and 18 U.S.C. § 3551 et seq. and N.Y. Penal Law §§ 125.25(3) and 120.00; 2) Hobbs Act robbery conspiracy in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 3551 et seq.; 3) Hobbs Act robbery in violation of 18 U.S.C. § 1951 and 18 U.S.C. § 3551 et seq.; and 4) using and carrying a firearm in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 3551 et seq.

---

[1] The Palacios brothers were first charged for crimes related to the conduct for which they were sentenced in this case in another case in the Southern District of New York, United States v. Palacios, Case No. 96-CR-372 (MGC) (S.D.N.Y. April 3, 1997), but the trial ended in a mistrial and the government opted not to continue that prosecution due to venue issues. (Defs. Mot. 10-11.) The government then charged the Palacios brothers in this case. (Id.)

On July 17, 1998, I sentenced each of the Defendants to life imprisonment on the VICAR murder count, 240 months' imprisonment on the Hobbs Act robbery and conspiracy counts, and a 60-month consecutive sentence on the firearms count. (See D.E. ## 47, 49.)

## II. Subsequent History

The Second Circuit affirmed the convictions on direct appeal. Over the next two decades, the Palacios brothers filed two sets of petitions collaterally challenging their sentences under 28 U.S.C. § 2255, both of which were unsuccessful. See Memorandum and Order, Palacios v. United States, No. 00-cv-1906 (CBA) (E.D.N.Y. Aug. 17, 2001), D.E. # 27; Memorandum and Order, Palacios v. United States, No. 00-cv-6028 (CBA) (E.D.N.Y. Aug. 20, 2001), (D.E. ## 17, 133, 134). The Palacios brothers, now forty-nine years old, have now served more than twenty-eight years of their life sentences.

## DISCUSSION

### I. Controlling Standards

Under section 3582(c)(1)(A), once a defendant has exhausted his administrative remedies, as the Palacios brothers have done (Defs. Mot. 19), a district court may reduce a sentence, "after considering the factors set forth in section 3553(a) to the extent they are applicable," when "extraordinary and compelling reasons warrant a reduction." 18 U.S.C. § 3582(c)(1)(A).

Congress has delegated to the Sentencing Commission the power to define the circumstances in which "extraordinary and compelling reasons" exist. The Guidelines list six categories of such circumstances. The category relevant here is the catch-all "Other Reasons" clause, which provides:

> Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

3

U.S.S.G. § 1B1.13(b)(5). The Commission has explained that these circumstances need not be "similar in nature and consequence to the specified reasons," but need only be similar "in gravity, a requirement that inheres in the statutory requirement that they present extraordinary and compelling reasons for a sentence reduction." Nov. 1, 2023 Amendments to U.S.S.G. at 10. "[T]he fact that an extraordinary and compelling reason could been known . . . by the sentencing court does not preclude consideration for a reduction" under the First Step Act. U.S.S.G. § 1B1.13(e).

The only limit with respect to the court's discretion to consider all possible extraordinary and compelling reasons, similar in gravity to the enumerated reasons, that defendants might bring before them in motions for sentence reduction under the First Step Act is that "[r]ehabilitation alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t); see also U.S.S.G. § 1B1.13(d). Rehabilitation may, however, be considered in combination with other circumstances. U.S.S.G. § 1B1.13(d).

**II.   Extraordinary and Compelling Reasons**

The Palacios brothers must first show that they have presented extraordinary and compelling reasons for sentence reductions under the Guidelines. They contend that a number of factors considered together amount to extraordinary and compelling reasons, including: (1) their young age at the time they committed the crimes for which they were convicted (Defs. Mot. 21-26); (2) the length of the sentences they have already served (id. 26-28); (3) their "genuine and extraordinary" rehabilitation, character, remorse, and acceptance of responsibility (id. 28-39); and (4) the risk posed by the COVID-19 pandemic and the harsh imprisonment conditions the pandemic has generated (id. 40-46).

**A.   Youth at the Time of Their Offenses**

4

Defendants argue that evolving Supreme Court jurisprudence regarding the impact of offenders' youth on their culpability should counsel the Court to consider the Defendants' age at the time of the offense—eighteen years and thirty-one weeks—as contributing to extraordinary and compelling reasons in favor of sentence reduction. (Defs. Mot. 21-26.)

In Roper v. Simmons, the Supreme Court held that the death penalty for a person under the age of eighteen was "cruel and unusual punishment" in violation of the Eighth Amendment. 543 U.S. 551 (2005). The Court explained that "juvenile offenders cannot with reliability be classified among the worst offenders" because they frequently have "[a] lack of maturity and an underdeveloped sense of responsibility," "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," and their personality traits are "more transitory, less fixed." Id. at 569-70.

In Graham v. Florida, the Court subsequently held that sentencing a juvenile to life without parole for non-homicide crimes also violated the Eighth Amendment. 560 U.S. 48 (2010). The Court based its holding on recent "developments in psychology and brain science" demonstrating that "parts of the brain involved in behavior control continue to mature through late adolescence," meaning that the actions of a juvenile "are less likely to be evidence of irretrievably depraved character than are the actions of adults." Id. at 68-69.

Two years later, the Court in Miller v. Alabama extended its Graham holding to encompass mandatory sentences of life without parole for juveniles convicted of homicide crimes, explaining that "the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate." 567 U.S. 460 (2012).

To be sure, none of these Supreme Court cases are directly on point with respect to the Palacios brothers' sentences, as they were over the age of eighteen when they committed their

crimes. The Second Circuit has held that Miller does not apply for defendants over that age. United States v. Sierra, 933 F.3d 95, 97 (2d Cir. 2019). Nevertheless, Defendants point out that the Court in Roper drew the line categorically at the age of eighteen because "a line must be drawn" but acknowledged that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Roper, 543 U.S. at 574. Defendants also persuasively cite several cases in which district courts have considered a defendant's age of eighteen at the time of offense as a contributory factor in finding extraordinary and compelling circumstances for sentence reduction. (Defs. Mot. 61-70; First Defs. Ltr. 6-8; Second Defs. Ltr. 3); see also, e.g., United States v. Cheng, 678 F. Supp. 3d 312, 313 (E.D.N.Y. 2023) ("[Y]outh has been accorded overdue recognition as a potent mitigating factor in culpability and rightful ground for reducing harsh sentences imposed by courts that could not . . . adequately account for it."); United States v. Ramsay, 538 F. Supp. 3d 407 (S.D.N.Y. 2021) (reducing the life sentence of a defendant convicted of VICAR and explaining that although the Supreme Court cases on the constitutionality of adolescent punishment "apply only to minors under the age of 16 or 18 . . . they offer a useful starting point by demonstrating the Supreme Court's approach to adolescent crime"); United States v. Lara, 658 F. Supp. 3d 22, 34 (D.R.I. 2023) (holding that the defendant's age of eighteen when he committed non-trigger felony murder was an extraordinary and compelling reason to consider a sentence reduction).

The government contends that this argument is procedurally improper, as "a motion for compassionate release should not be used to attack the legitimacy of a judge's imposed sentence." (Gov't Opp'n 6 (quoting United States v. Antney, No. 17-CR-229 (CBA), 2021 WL 4502478, at *5 (E.D.N.Y. Sept. 30, 2021)).) The government also points out that I've already rejected

Defendants' habeas petition challenging the sentence as cruel and unusual based on similar arguments. (Id.)

I agree with Defendants and the other district courts, however, that Defendants' request is procedurally proper. Defendants in their instant motion are not challenging the legitimacy of the sentence at the time it was imposed, and they concede that the Supreme Court Eighth Amendment cases are "not directly applicable to them." (Defs. Mot. 22.) Rather, Defendants' argument is that the intervening Supreme Court case law expressing that the culpability of an eighteen-year-old adolescent is less than that of an adult convicted of the same crimes is persuasive authority for considering age as one factor that can contribute to a finding of extraordinary and compelling reasons. (Id. 22-23; Defs. Reply 2-4); see also Cheng, 678 F. Supp. 3d at 314-15 (considering youth as a "mitigating factor in culpability" in granting a motion for sentence reduction).

The government also cites cases in which courts in this district have rejected arguments based on relative youth at the time of offense as "not controlling in th[e] context" of compassionate release. (Gov't Opp'n 6.) These cases are clearly distinguishable. In United States v. Harris, Judge Ross denied the defendant's request for sentence reduction based on his youth at the time of the offense because "he was in his mid-twenties when he committed the offenses at issue here." No. 04-CR-203 (ARR), 2022 WL 3053710, at *1 (E.D.N.Y. Aug. 3, 2022). In United States v. Tran, Judge Kovner only held that "relative youth is not—standing alone—an extraordinary and compelling reason for a sentence reduction" and conceded that courts have found extraordinary and compelling reasons in cases where defendants rely on "a constellation of factors in combination with youth[,] typically including demonstrated rehabilitation." No. 90-CR-1019 (RPK), 2022 WL 7132195, at *2-3 (E.D.N.Y. Oct. 12, 2022) (internal quotation omitted).

I am persuaded that, in light of the evolution of Supreme Court jurisprudence regarding the diminished culpability of adolescents since the Palacios brothers were sentenced, their youth at the time of their offense "counsels against a life sentence," Ramsay, 538 F.Supp.3d at 424, and, in the sentence reduction context and in conjunction with other factors, constitutes an extraordinary and compelling reason in favor of reducing their sentences.

### B. Length of Time Served

Defendants also argue that the length of time they have already served—more than twenty-eight years, "representing their entire adult li[ves]"—should also contribute to a finding of extraordinary and compelling reasons for sentence reduction. (Defs. Mot. 26-28.)

As support for this argument, Defendants cite two circuit court cases, United States v. Maumau, 993 F.3d 821, 837 (10th Cir. 2021), and United States v. McCoy, 981 F.3d 271, 278 (4th Cir. 2020). (Defs. Mot. 27.) Defendants contend that these cases stand for the proposition that the fact that they "have already served more time than both the mean (343 months) and median (372 months) terms of imprisonment imposed on defendants who were sentenced over the past five fiscal years" with a similar offense level can be considered an extraordinary and compelling reason.

I am not persuaded that the length of the sentences that Defendants have served can contribute to extraordinary and compelling reasons for sentence reduction. As a preliminary matter, the cases cited by Defendants are non-binding decisions of other circuits. Moreover, these cases are distinguishable. In both Maumau and McCoy, the trial courts had not found extraordinary and compelling reasons based on the length of the sentence itself. Rather, the district courts found that the defendants' "incredibl[y]" long sentences had been based on the practice of sentence-stacking for violations of 18 U.S.C. § 924(c), which Congress had since eliminated in the

First Step Act. See McCoy, 981 F.3d at 278; Maumau, 993 F.3d at 837. The district courts reasoned that "if sentenced today," the defendants would not be subject to nearly as long a term of imprisonment, and that discrepancy, along with other factors, amounted to extraordinary and compelling reasons supporting sentence reduction. McCoy, 981 F.3d at 278; Maumau, 993 F.3d at 837. By contrast, the Palacios brothers were sentenced to the mandatory minimum for VICAR under 18 U.S.C. § 1959(a)(1), a statute which is still in effect. If sentenced today, the Court would still be obligated to impose the same sentence. Accordingly, the length of the sentence itself cannot contribute to extraordinary and compelling reasons warranting reduction.

### C. Rehabilitation

Defendants' next proffered extraordinary and compelling reason is their "genuine and extraordinary" rehabilitation. (Defs. Mot. 28-36.) Defendants acknowledge that rehabilitation alone cannot be considered an extraordinary and compelling reason, but correctly note that I can take rehabilitation into account in combination with other factors, such as their youth at the time of their offenses. (Id. 28); see also, e.g., United States v. Millan, No. 91-CR-685 (LAP), 2020 WL 1674058, at *8 (S.D.N.Y. Apr. 6, 2020) (finding extraordinary and compelling reasons where the defendant had "done everything in his power to rehabilitate himself, as demonstrated by his genuinely exceptional accomplishments and meritorious prison record" over his three decades in prison "despite having had no realistic hope of release").

Defendants describe an impressive record of rehabilitative efforts. Apart from holding a series of full-time jobs at the Bureau of Prisons (BOP) facilities in which he has been incarcerated, Jason earned his GED and enrolled in a number of college programs, where he has maintained an excellent academic record, and the faith-based Threshold Program. (Defs. Mot. 29 (stating that Jason is enrolled at Coastline Community College, where he is majoring in sociology and

9

maintains a 4.0 GPA, Merced Community College, and Adams State University); First Defs. Ltr. 3-4 ("[Jason] has completed all the coursework needed to earn his associate degree except for college algebra (which he is precluded from taking because he is incarcerated).") Jason has also earned multiple employment credentials and participated in numerous training offerings focused on marketable employment skills. (Id. 29-31 (listing Jason's educational and training achievements, including earning certifications in HVAC, construction, accounting, and various other employment-related areas); see also id. Ex. 8 (Jason's resume).) In April 2022, notwithstanding his life sentence, Jason was selected for placement in the Transition Unit at USP Atwater, a step-down unit for inmates with a low risk of recidivism who are soon to be released from custody. (Defs. Mot. 31.)

Edwin has a similar record of efforts at self-improvement through education, training and employment. (Id. (listing Edwin's employment and training achievements, including completing 929 hours in a U.S. Department of Labor Education and Training Apprenticeship and earning a Customer Service Specialist Certification); First Defs. Ltr. 2 ("After hundreds of hours of studies and clinical work, Edwin earned his Credentialed Alcohol Substance Abuse Counselor (CASAC) certification from the State of New York's Office of Addiction Services and Support (OASAS)."); see also Defs. Mot. Ex. 9 (Edwin's resume).) Although FCI Ray Brook, the facility in which he is incarcerated, had determined that he was ineligible for the Second Chance Pell College Program because of his life sentence (Defs. Mot. 31), Edwin persuaded the facility to allow him to enroll in North Country Community College as of Fall 2023. (Defs. Reply 9). At North Country Community College, Edwin has maintained a 4.0 GPA and been named to the President's List. (First Defs. Ltr. 1-2.)

Defendants also include as exhibits (and excerpt in their brief) letters from BOP correctional officers and other BOP officials attesting to the extraordinary nature of their efforts to better themselves. (See id. 32-34.) A former warden at one facility in which Edwin was incarcerated extolled Edwin's "hard work and dedication," "fortitude" and "selfless[ness] [in] mak[ing] the effort to help others" in a penitentiary environment. (Id. 32.) Instructors at FCI Ray Brook, where Edwin is currently incarcerated, noted that he is a mentor and positive example for the younger inmates, described him as "reliable," "trustworthy," and an "excellent worker," and praised his "stellar work ethic." (Id. 32-33.) Descriptions of Jason echo the same themes. BOP officials have described Jason as "welcom[ing] opportunities of growth and development" and noted that Jason's "eagerness" at his job "has inspired other workers to achieve more." (Id. 33; see also First Defs. Ltr. 5.) The chaplain at USP Atwater, where Jason is currently incarcerated, noted that Jason has been serving as one of the mentors in the faith-based Threshold program and commended his "[o]utstanding" "quest for self-improvement and [] act[ing] deliberately in nullifying the behavior that resulted in his incarceration." (Defs. Mot. 3.)

Defendants further point to their disciplinary history and, while acknowledging that they incurred disciplinary infractions in their earlier years in prison, point out that, more recently, their record has been strong: Jason has not had any disciplinary violations since August 2017, and Edwin has not had any disciplinary violations since September 2018. (Id. 34.) Defendants also note that their rehabilitative efforts are particularly unique "because they engaged in all such positive activities without any tangible incentive or potential benefit other than self-improvement, given that their life sentences meant they could not earn any 'good conduct time' or receive any other sentence reduction benefit and given that they had no realistic hope of applying that which they learned behind bars in the 'real world.'" (Id. 36.)

11

Relatedly, Defendants submit letters from friends who knew them as adolescents and have kept up their relationship to the extent possible during Defendants' incarceration. The friends also attest to Defendants' rehabilitation, reporting that Jason and Edwin "have learned from their mistakes and are sincere about making amends" (Defs. Mot. Ex. 37) and "have evolved, matured, and grown" through their time in prison. (Id. Ex. 40.) Defendants themselves, as well as their counsel, Mr. Levitt, have written letters attesting to the grief, remorse, and shame they feel over the death of Mr. Vulfson. (Defs. Mot. 38-39; id. Exs. 34, 48-49.)

The government concedes that the Palacios brothers' "efforts at rehabilitation . . . are commendable" but argues that the rehabilitation "is relatively recent," and Defendants have not been exemplary prisoners throughout their time in prison. (Gov't Opp'n 9.) The government points out that, among other less serious infractions, Edwin committed two weapons infractions, one in 2011 when a homemade weapon was recovered under his scrotum, and another in 2000 when he was found in possession of a dangerous weapon. (Id.) Jason broke a fire sprinkler in his cell in 2017 and played a role in an assault involving the Latin Kings in his facility in 2005. (Id.) These infractions, the government contends, undermine Defendants' argument that their rehabilitation is an extraordinary and compelling reason for reducing their sentences. (Id.) The government further contends that attestations to Defendants' character are undermined by the severity of their offense and their infractions while incarcerated, and that Defendants' "belated" remorse is unpersuasive 30 years after the offense. (Id. 10.)

In response, Defendants contend that their rehabilitative journeys are not recent but began more than two decades ago, soon after they were incarcerated, as detailed in their respective resumes, and has only accelerated in recent years. (Defs. Reply 9.) As to the serious infractions the government argues undermine their claims of being rehabilitated, Defendants submit that the

12

infractions should be viewed as anomalies attributable to "enter[ing] custody as 18-year-old boys just off the street." (Id. 9-10.) That prison has not made them perfect, Defendants argue, should not undermine their "striving to achieve excellence for almost three decades." (Id. 10.)

Review of their respective records has persuaded me that Defendants' trajectory over the almost three decades of their incarceration has been a decisive turn away from violence and towards rehabilitation. Edwin's last serious infraction—possession of a homemade weapon on his person—took place over a decade ago, in April of 2011. (See D.E. # 142 Ex. C.) Jason's last violent infraction—involvement in an "assault due to Latin King discipline"—was in October of 2005, nearly two decades ago. (See D.E. # 142 Ex. D.) The amount of time that has elapsed, combined with their demonstrated focus on education, full-time employment, and self-improvement, clearly indicates that they have matured and rehabilitated significantly and are likely to lead law-abiding lives once released. This impression is reinforced by the attestations of BOP officials and by the strong expressions of remorse by Defendants, both in their own words and as corroborated by their counsel. I find that the Palacios brothers' rehabilitation and remorse supports a reduction of their sentences. See United States v. Lugo, No. 01-CR-922 (NG), 2022 WL 732153, at *5 (E.D.N.Y. Mar. 11, 2022) (finding that a defendant's rehabilitation supported a sentence reduction where "[h]is most serious infractions took place over 10 years ago" and his most recent

13

infraction "did not involve any violence"); Millan, 2020 WL 1674058, at *10 (finding extraordinary and compelling reasons in part based on extraordinary rehabilitation and remorse).[2,3]

### III. The Section 3553(a) Factors

I now consider whether the applicable section 3553(a) factors support the Palacios brothers' request for sentence reduction. The factors include: (1) the nature and circumstances of their offenses, (2) Defendants' history and characteristics; (3) the need for their sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public; (4) the need for rehabilitation; and (5) the need to avoid unwarranted sentencing disparities.

It is indisputable that the Palacios brothers' offenses were extremely serious. Although only Jason ultimately shot Vulfson, Edwin "aided and abetted the robbery by participating in the planning of the crime" with Suarez, "hailing a cab, sitting in the cab with his brother without objecting to the robbery, and lending his presence and the gun he was carrying in support of the crime should the plan go awry." Palacios, 1999 WL 197216, at *2.

Nevertheless, an analysis of the factors leads me to conclude that the factors do not "outweigh the extraordinary and compelling reasons warranting compassionate release" and that reducing Defendants' sentences would not "undermine the goals of the original sentence[s]."

---

[2] I note that the cases cited by the government in opposing the Court's consideration of Defendants' rehabilitation are all inapposite. In some of the cases, the court found no other extraordinary and compelling reason for sentence reduction apart from rehabilitation. See, e.g., United States v. Robinson, No. 21-CR-1865, 2022 WL 2204126, at *3 (2d Cir. June 21, 2022) (summary order) (affirming the district court's holding that the defendant's efforts at rehabilitation, "though commendable, do [] not justify release in the absence of other extraordinary and compelling reasons") (alteration in original) (internal quotation marks omitted). In others, the court found that even if there were extraordinary and compelling reasons, an evaluation of the section 3553(a) factors "counseled against release." See, e.g., United States v. Garcia, No. 21-CR-1181, 2022 WL 2154675, at *2 (2d Cir. June 15, 2022) (summary order); United States v. Reyes, No. 20-3285, 2022 WL 1669388, at *1 (2d Cir. May 26, 2022) (summary order).

[3] Defendants argue as other grounds for a finding of extraordinary and compelling reasons the threat to their health from COVID-19 given their medical conditions. (Defs. Mot. 42-46.) I need not address these arguments as I find Defendants' other proffered grounds constitute extraordinary and compelling reasons.

14

United States v. Ebbers, 432 F. Supp. 3d 421, 430-31 (S.D.N.Y. 2020) (internal quotations omitted). A sentence reduction is warranted to fulfill the directive of the "parsimony clause" – that is, to impose sentences that are "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

Having conceded that both Jason and Edwin's offenses were severe, I note that the reduced sentence I order is commensurately substantial. The Palacios brothers were eighteen years old when they committed their crimes, and they have now served over twenty-eight years in prison. If Defendants had been just thirty-one weeks younger at the time of their offenses, the Supreme Court's subsequent holding in Miller would have precluded a sentence of life without parole as cruel and unusual punishment. In fact, the brothers were over eighteen years old, so the mandatory minimum of life applied. However, as the Supreme Court noted in Roper, "[t]he qualities that distinguish juveniles from adults" with respect to culpability "do not disappear when an individual turns 18." 543 U.S. at 574. Ameliorating the effects of the mandatory minimum where Defendants were so close to the bright line separating juveniles from adults will not overly dilute the deterrent effect on others considering similar crimes. Moreover, as Defendants note in their reply, the fact that the government, after the Palacios brothers' first trial in the Southern District ended in a mistrial, asked defense counsel whether Defendants would accept a 10-year plea deal is an indication that the policy of deterrence could be adequately served by a reduced sentence. (Defs. Reply 18 n.13.)

Reducing Defendants' sentence also promotes the goal of rehabilitation. As detailed above, Defendants have taken advantage of all educational, training, and employment opportunities afforded them.

The government contends that the Palacios brothers still pose a danger to the public based on their serious disciplinary infractions during their incarceration. But this is belied by consideration of their full records, which demonstrate successful efforts at rehabilitation. Based on their respective roles in their offenses, Jason, as the individual pulling the trigger, would pose more of a danger to the public. But as detailed above, Jason's last violent infraction was in 2005, and USP Atwater has determined that he presents a sufficiently low risk of recidivism to be placed in the Transition Unit along with inmates who are soon to be released from custody. Edwin's last serious infraction was more recent, when he was found in possession of a homemade weapon in 2011, but his less central role in the death of Vulfson as well as the decade that has elapsed without further serious infractions provide reason to believe that Edwin does not pose a significant danger to the public.[4] Moreover, I am leaving in place the consecutive five-year term of imprisonment I imposed on the Palacios brothers for violating section 924(c).[5]

## IV. Length of Sentence

Having determined that reducing Defendants' sentences is motivated by extraordinary and compelling circumstances and justified by the section 3553(a) factors, I must determine by how much those sentences will be reduced.

Defendants ask that I re-sentence them to time served and five years' supervised release. (Defs. Mot. 12.) Although, as I have concluded above, the section 3553(a) factors justify a

---

[4] Defendants argue that another section 3553(a) factor, "the need to avoid unwarranted sentencing disparities," weighs in favor of sentence reduction. Defendants list a number of individuals with whom Defendants were charged, including Suarez, and note that these co-defendants served between five and fourteen years, significantly less than Defendants' life sentences. (Defs. Mot. 52-53; Defs. Reply 7.) I agree with the government, however, that the only person relevant for the purposes of sentence disparity is Suarez, who participated alongside Defendants in the Vulfson murder, and that the disparity between his sentence and that of the Defendants is not unwarranted, as Suarez cooperated with the government and pleaded guilty. See United States v. Van Manen, No. 18-CR-30-3 (PAC), 2022 WL 842989, at *3 n.3 (S.D.N.Y. Mar. 22, 2022), aff'd, No. 22-980, 2023 WL 4068284 (2d Cir. June 20, 2023).

[5] I am aware that the BOP's application of good time credits under 18 U.S.C. § 3624(b)(1) may result in a reduction of this sentence.

16

sentence reduction, they do not justify the reduction that Defendants seek. I have the authority to reduce Defendants' sentence to some period between the original sentence and Defendants' request. See, e.g., Lugo, 2022 WL 732153, at *10 (re-sentencing a defendant to a 25-year sentence based on extraordinary and compelling circumstances).

As such, I re-sentence Defendants to thirty years for their VICAR convictions, five years to be served consecutively for their section 924(c) convictions, and five years of supervised release. The amended sentence is consistent with the section 3553(a) factors. It reflects the seriousness of Defendants' offenses and promotes the respect of law. At the same time, this reduction also recognizes Defendants' strong rehabilitation records and their youth at the time of the offense.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Defendants' motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Defendants' VICAR sentences are reduced to thirty years and their consecutive five-year section 924(c) sentences remain in place, to be followed by a five-year term of supervised release. The Court need not take action as to Defendants' robbery and conspiracy sentences pursuant to 18 U.S.C. § 1951 and 18 U.S.C. § 3551 because Defendants have fully served those sentences. (See D.E. # 137 Ex. 4 ("Sentencing Tr.") 24 (noting that Defendants' sentences on these convictions were to be served "concurrently with each other and with" Defendants' VICAR life sentences).)

If the BOP determines that the Palacios brothers have accumulated sufficient good-time credits such that there is no time remaining on their sentences, then this order shall not take effect immediately. Instead, this order shall be stayed for up to seven days to allow BOP to verify the Palacios brothers' residences, ensure that the Palacios brothers have release plans, and make appropriate travel arrangements. See United States v. Monteleone, No. 92-cr-351 (ARR), 2023

WL 2857599, at *6 (E.D.N.Y. April 10, 2023). The Palacios brothers shall be released as soon as their residences are verified and the proper arrangements are made. If the parties need more than seven days to complete these prerequisites to the Palacios brothers' release, the parties shall promptly notify me and show cause as to why I should extend the stay. An amended judgment will follow.

SO ORDERED.

Dated: May 20, 2025
Brooklyn, New York

/s/Carol Bagley Amon
Carol Bagley Amon
United States District Judge

18